**O**

# United States District Court
# Central District of California

CLIFFORD MERLO,

　　　　　　　Plaintiff,

　　v.

DENIS MCDONOUGH[1],

　　　　　　　Defendant.

Case № 2:19-cv-05078-ODW (JCx)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.　INTRODUCTION

On February 13 through 16, 2024, the Court held a bench trial in this action. Plaintiff Dr. Clifford Merlo tried two claims against Defendant Denis McDonough, Secretary of Veterans Affairs, U.S. Department of Veterans Affairs ("VA"), for age discrimination and retaliation. The parties submitted documentary evidence and elicited testimony from witnesses Dr. Ahmad Sadeghi, Tanae McNeal, Bradford Krutoff, Dr. Michael Chung, Dr. Steve Lee, Dr. William Lorentz, Heather Xitco, Dr. Merlo, and Dawn Kovner. Additionally, the Court engaged in its own questioning of witnesses.

Having carefully reviewed and considered the evidence and arguments of counsel as presented at trial and in their post-trial written submissions, the Court issues the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Denis McDonough is automatically substituted for Robert L. Wilkie.

following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).  To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such, and vice versa.

## II.   FINDINGS OF FACT

1.     Dr. Clifford Merlo was born in 1953.  A board-certified radiation oncologist, Dr. Merlo was fifty-eight years old and had been practicing radiation oncology for twenty-five years when he began working as a radiation oncologist in the Department of Radiation Oncology ("DRO") at the VA's West Los Angeles Healthcare Center ("WLAHC") in January 2012.

2.     Radiation oncology is the medical specialty involving the use of radiation to treat cancer.

3.     Dr. Ahmad Sadeghi, born in 1939, was approximately seventy-three years old when he hired Dr. Merlo to work at the DRO.  Dr. Sadeghi was the Chief of the DRO and Dr. Merlo's immediate supervisor.  Dr. Sadeghi made the hiring decisions in the DRO.

4.     Dr. Steve Lee, born in 1961, was Director of Radiation Oncology for the VA Integrated Service Network VISN 22 in 2014 and 2015.  At WLAHC, Dr. Lee was Dr. Sadeghi's supervisor, and Dr. Merlo's second level supervisor.

**A.     VA Physician Appointments**

5.     The VA is authorized to hire physicians under 38 U.S.C. § 7405 ("Title 38") into three types of appointment: fee basis, temporary, and permanent.[2]

6.     A fee basis appointment provides a physician temporary employment, paid on an as-needed basis, up to the approved budgeted salary.

---

[2] Tanae McNeal testified that all physician appointments under Title 38 were considered "excepted service positions," termed either "excepted appointment," or "excepted appointment not to exceed." McNeal did not call these appointments "permanent," because to HR personnel, "permanent" implicates Title 5, not Title 38.  Nevertheless, in this order, the Court refers to a Title 38 "excepted appointment" as a "permanent appointment," and a Title 38 "excepted appointment not to exceed" as a "temporary appointment."  This nomenclature is consistent with the parties' briefs and the record in this litigation.

7.      A temporary appointment provides a physician a full-time position for a set period of time, with start and end dates predetermined at the appointment's outset. When a temporary appointment expires, the employment of the individual ends unless an extension is approved.  A temporary appointment can be extended up to a total of four years with VA leadership approvals.  Once a temporary appointment reaches that limit, it is completely expired and a new job announcement must be created.  There is no right to extension of a temporary appointment.  When a temporary appointment is nearing the end of its term, VA Human Resources ("HR") is alerted.  HR then emails the relevant service chiefs to inquire whether they have obtained approval to extend a temporary appointment.  The timing of the HR reminder email to a service chief varies because HR personnel must first generate a report of the expiring temporary appointments.

8.      A permanent appointment provides a physician a full-time position with no predetermined end date.  After an initial two-year probationary period, a physician in a permanent appointment can be terminated only for cause.

**B.      Dr. Merlo's VA Appointments**

9.      In January 2012, Dr. Sadeghi initially hired Dr. Merlo into a fee basis appointment because an oncologist left the DRO unexpectedly, leaving a shortage of physicians.

10.      By late July 2012, Dr. Sadeghi had obtained approval for a temporary appointment not to exceed thirteen months.  He asked Dr. Merlo to apply.  Dr. Sadeghi was able to obtain authorization for a temporary appointment more easily and quickly than he could have for a permanent appointment.

11.      Dr. Merlo contends the job announcement contained the word "permanent," but McNeal credibly testified that the word "permanent" did not appear on the final posted 2012 job announcement.

12.      Dr. Sadeghi had no other applicants for the 2012 job announcement.

13.     On August 26, 2012, Dr. Sadeghi hired Dr. Merlo into the temporary appointment for thirteen months, with a predetermined end date of September 26, 2013.

14.     Dr. Merlo's temporary appointment was subsequently extended six months, from September 26, 2013, to March 31, 2014, and then another six months, from April 1, 2014, to October 31, 2014.

15.     In August 2014, Dr. Lee emailed Dr. Sadeghi to recommend Dr. Kang, a UCLA resident, for a permanent position in the DRO.  Dr. Sadeghi received numerous emails such as Dr. Lee's from doctors and residents asking for jobs at the VA. Dr. Sadeghi disregarded the email about Dr. Kang.

16.     Also in August 2014, Drs. Sadeghi and Lee requested that Dr. Merlo's appointment be extended again.  Thus, Dr. Merlo's appointment was extended for another six months, from November 1, 2014, to May 1, 2015.  Drs. Sadeghi and Lee did not consider and made no decision at that time about what would happen when Dr. Merlo's appointment expired.

17.     Drs. Sadeghi and Lee both believed, based on information they received from superiors and HR, that they could not extend Dr. Merlo's temporary appointment again.  They understood that they would instead need to seek authorization for a new appointment, which they eventually did.

18.     In April and May 2015, mediation between Dr. Merlo and the VA led to two more brief extensions of Dr. Merlo's temporary appointment, from May 1 to May 15, 2015, and then to May 30, 2015.

19.     On May 30, 2015, Dr. Merlo's temporary appointment with the VA expired by its terms and was not subsequently extended or renewed.

C.     **Evidence Confirming Dr. Merlo's Temporary Appointment**

20.     Although Dr. Merlo claims he believed he was in a permanent appointment, correspondence and Dr. Merlo's personnel file confirm that Dr. Merlo was never in a permanent appointment with the VA.

21.     For instance, in July 2012, when Dr. Sadeghi forwarded Dr. Merlo the initial job announcement notice and asked Dr. Merlo to apply, Dr. Sadeghi's originating email clearly requested approval for a temporary not to exceed appointment.

22.     Additionally, throughout Dr. Merlo's employment with the VA, each time HR processed an action in Dr. Merlo's personnel file, Dr. Merlo received a Notice of Personnel Action.  These Notices indicate Dr. Merlo's appointment was temporary with a not to exceed date of expiration.

23.     Furthermore, on at least two occasions during his employment with the VA, Dr. Merlo's pay was interrupted due to a lapse in his appointment.  Each time, his earnings and leave statement reflected "Pay suspended, temporary appointment expired."  When questioned about these statements at trial, Dr. Merlo testified, "I knew I was a temporary, but I didn't actually know what it meant."  He said he "didn't read it at the time."

24.     Thus,  Dr. Merlo knew he was in a temporary not-to-exceed appointment and a reasonable person in Dr. Merlo's position would have known they were in a temporary not-to-exceed appointment.   Dr. Merlo's claims that the VA hid his employment status from him are not credible.

**D.     Dr. Merlo's Performance in the DRO's Multidisciplinary Practice**

25.     Radiation oncology requires various personnel and departments to work well together to provide effective treatment.  A radiation oncologist cannot deliver radiation treatment alone and must "team up" with other specialists in the DRO, such as physicists, dosimetrists, radiotherapists, nurses, and other supportive personnel. Morale within the department is important because cooperation is needed for the multidisciplinary practice.   Relatedly, interpersonal relationships in the DRO are important because all personnel must work harmoniously to provide effective treatment.

26.     While Dr. Merlo was with the DRO, other employees complained to Dr. Sadeghi about Dr. Merlo's inappropriate group emails.  Dr. Sadeghi was concerned these conflicts between employees would lower morale and cooperation in the DRO.

Some of Dr. Merlo's group emails: accused his colleagues of improper conduct; suggested a colleague come to work "au natural"; told a nurse who had reported him for endangering a patient, "Oh, I bet you'd like to stick me"; invited "all the pretty girls" to come to his office and shave his head; and circulated unprofessional content that he found humorous, such as "Men are Just Happier People," "The world is your urinal," and "same work, more pay."

27.    Dr. Merlo also had a propensity for sending complaint emails to upper VA leadership and copying "unfortunately everybody."   For instance, in July 2014, Dr. Merlo emailed the hospital Chief of Staff and the DRO physicians threatening to go to the LA Times about a routine medication inquiry.  Dr. Sadeghi counseled Dr. Merlo to email Dr. Sadeghi first before emailing upper VA leadership or going outside the department.  Despite Dr. Sadeghi's counseling, Dr. Merlo later emailed the Chief of Staff, the VA's national Chief of Radiation Oncology, and several others about a patient referral of Dr. Merlo's that had been denied.

28.    Charting is the way physicians record treatment notes, communicate, and coordinate a patient's medical care across departments.  A patient has access to their chart.  Dr. Merlo recognizes that charting is of great importance to ensure clear communication.  Nevertheless, Dr. Merlo uses unknown abbreviations and shorthand in his charting, making his charts difficult to understand, and slowing a patient's treatment while others tracked down a translation.

29.    Dr. Merlo also included inappropriate comments in patient charts.  For example, in one patient's chart, he accused another department of torturing the patient by failing to prescribe pain medication.  This charting issue was elevated to the acting Chief of the WLA VA Hospitalist Division and to Chief of Staff Dr. Norman.  Dr. Norman directed Drs. Sadeghi and Lee to investigate Dr. Merlo's "very inappropriate behavior/charting," with the Professional Standards Board.  Although Dr. Merlo later apologized for accusing the other department, he also noted his pleasure at having "gotten [their] attention."

30.     In September 2013, a patient reported Dr. Merlo for sexual harassment concerning comments that Dr. Merlo made to the patient during a consultation.  The sexual harassment complaint was brought to the attention of Dr. Sadeghi and Dr. Norman, among others.  Dr. Merlo ultimately wrote a letter of apology, but the patient never returned to the DRO for further treatment.  Dr. Merlo does not acknowledge that he said or did anything wrong.  He testified that he thought he and the patient "had a good rapport," and "were on good terms," including after the consultation.  He was surprised by the sexual harassment complaint.

31.     Dr. Merlo contends Dr. Sadeghi gave him only positive performance reviews.  However, the evidence to which Dr. Merlo cites consists of OPPE Reports, or Ongoing Professional Practice Evaluations, which monitor medical practice issues that could impact patient care.  (*See* Tr. Ex. 54 (tracking diagnosis codes, appropriate prescription, and treatment progress, among others).)  Dr. Sadeghi testified that these reports were "kind of formality . . . everyday doing"; they did not evaluate Dr. Merlo's performance in the DRO.  Dr. Sadeghi also testified that although Dr. Merlo "did a good job on what he was hired for," there "was many problem" and "many issues" with Dr. Merlo.  Dr. Sadeghi's handwritten remarks on the OPPE Reports, such as "Dr. Merlo has done a good job as Radiation Oncologist," was "not the best recommendation, but it is satisfactory."

**E.     Dr. Sadeghi's November Comments to Dr. Merlo**

32.     In late November 2014, Dr. Sadeghi informed Dr. Merlo that his temporary appointment would end in April 2015, and that Dr. Sadeghi would be requesting approval for a new position, for which Dr. Merlo could apply.

33.     At this meeting, Dr. Sadeghi also made a comment to Dr. Merlo about Dr. Merlo retiring.

34.     The exact substance and context of Dr. Sadeghi's comment is disputed.  Dr. Lorentz, another radiation oncologist in the DRO who likes and respects both Dr. Merlo and Dr. Sadeghi, testified credibly that Dr. Sadeghi's manner of phrasing

things is often awkward or unclear because English was not his first language. Dr. Merlo similarly testified that Dr. Sadeghi's "use of the English language is difficult." Dr. Sadeghi discussed the November meeting with Dr. Lorentz, who testified that he did not understand Dr. Sadeghi's retirement comment to mean he wanted Dr. Merlo to leave because of his age. Rather, Dr. Lorentz testified that Dr. Sadeghi was a kind department head with a non-confrontational style. Dr. Lorentz understood Dr. Sadeghi was trying to let Dr. Merlo down gently because of the expiration of his appointment, and because Dr. Sadeghi did not think highly of Dr. Merlo's as someone to retain in the DRO in view of the performance issues above.

35. At the November meeting, Dr. Merlo did not respond or object to Dr. Sadeghi during the six-to-ten minutes that followed the comment about retirement. Dr. Merlo did not speak to his colleagues about the meeting with Dr. Sadeghi that day or in the weeks that followed. He did not tell his partner that day, although he did inform her "[e]ventually." Dr. Merlo did not mention the meeting with Dr. Sadeghi until approximately three weeks later, on December 12, 2014, when he emailed the DRO physicians and a number of VA superiors about it.

**F.    DRO's Mission & 2015 Job Announcements**

36. In addition to treating patients, the DRO's mission includes research and publication, education, and the most advanced techniques in radiation oncology. Utilizing state-of-the-art techniques and technologies is important to the mission of the DRO as it improves patient care. Promotion of the science of radiation oncology through research and publication is also important in the DRO, as it advances the means of treatment. Participating in educational endeavors is also important in the DRO.

37. In the spring of 2015, Drs. Sadeghi and Lee requested approval from Dr. Norman for a new permanent position. Dr. Norman approved the request, meaning he forwarded the request to the department that would ultimately approve the new position.

38.     In June 2015, the VA posted a job announcement for a permanent radiation oncologist in the DRO.

39.     The announcement stated that the applicant "is expected to have completed sufficient training in the latest state-of-art radiation therapy techniques such as IMRT, IGRT, SRS and SBRT" and the applicant "is encouraged to develop research opportunities, and expected to promote and provide educational endeavors for Radiation Oncology residents and staff."

40.     The announcement was open for less than three weeks, from June 19 to July 9, 2015.

41.     The DRO received only eleven applications for the position, including Dr. Merlo's.

42.     Drs. Sadeghi and Lee ranked the applications according to the qualifications sought in the job announcement and identified the top finalists by the end of August 2015.

43.     The top ranked applicants for the June 2015 job announcement did not include Dr. Merlo because "the top names have a characteristic that [the DRO] desire[s]," including aspiration to clinical research and education, and technical knowledge in state-of-the-art treatment modalities.

44.     The top three applicants for the June 2015 job announcement did not accept the position, with the third withdrawing their application in early October 2015.

45.     Drs. Sadeghi and Lee consulted with hospital leadership about next steps. Dr. Sadeghi credibly testified that the quality of top applicants improved after approximately 2014.  Dr. Lee surmised the first job announcement was open for too short a period.  They and hospital leadership determined to open a job announcement for a longer window to "cast a wider net."  Accordingly, on October 29, 2015, the DRO opened the job announcement again, from October 29, 2015, to September 1, 2016.

46.     The DRO received possibly 50 to 100 applications to the October 2015 job announcement, including Dr. Merlo's.

47.     Drs. Sadeghi and Lee again ranked the applicants by qualifications. Dr. Sadeghi also solicited opinions from other physicians in the DRO.

i.     *Dr. Merlo's Qualifications*

48.     Dr. Merlo did not rank near the top-ranked applicants for the October 2015 job announcement.   Both Drs. Sadeghi and Lee testified that this was because there were better applicants than Dr. Merlo at that time.   Dr. Merlo's Curriculum Vitae ("CV") did not reflect experience with the requisite technologies, IMRT, IGRT, SRS, or SBRT.   Although Dr. Merlo's CV reflected his long on-the-job experience, it lacked the other criteria for a permanent appointment in the DRO, such as proficiency with state-of-the-art techniques, research experience, articles and publications, and a current academic appointment.[3]

49.     While Dr. Merlo was working at the DRO, Dr. Sadeghi did not see Dr. Merlo demonstrate an interest in learning or utilizing advanced techniques and technologies.

50.     Dr. Merlo acknowledged in 2011, before he was initially hired, that he would be expected to learn new techniques such as SRS, yet by August 2014, Dr. Merlo had not learned nor pursued medical privileges to treat patients with SRS therapy.

51.     Dr. Merlo did not publish any academic articles while at the DRO.   He submitted one manuscript to a journal during that time period, and it was poorly received and criticized by peer-reviewers and by Dr. Sadeghi.   Dr. Merlo was "too busy" to revise the manuscript and resubmit it.   Dr. Merlo conceded at trial that the last time he published an article was in 1989.   He has not led or been primary or co-primary investigator on any clinical trials in the past thirty-four years.   Dr. Merlo has not received any federal research grants in the past thirty-four years.

---

[3] Dr. Merlo's testimony that he had an academic appointment with UCLA during his employment at the VA is not credible.  Furthermore, he offered no corroborating evidence and the only appointment listed on his CV is dated 1986–1990.

      *ii.*    *Dr. Michael Cheung's Qualifications*

52.    Dr. Michael Cheung ranked as one of the top applicants for the October 2015 job announcement because he met all the criteria.  He was board certified and experienced and interested in advanced treatment technologies, teaching medical residents, and research and publication.

53.    Dr. Cheung had an extensive background publishing research in peer-reviewed journals.  He was proficient with state-of-the-art techniques, technologies, equipment, and software, including an expertise in SRS.  Dr. Cheung had completed a year in a fellowship, including as a radiation oncology instructor, and he belonged to multiple professional organizations.  In fact, he sought the position at the VA in part because the VA "offers opportunities to teach, and opportunities to conduct research and academic pursuits," as well as "an opportunity . . . to participate in [medical residents'] training," something Dr. Cheung had a "particular interest in."

54.    Dr. Sadeghi believed that Dr. Cheung was better qualified than Dr. Merlo, based on Dr. Cheung's education, radiation oncology training, research experience, and articles and publications.

55.    Dr. Sadeghi believed Dr. Cheung was the best-qualified candidate available and offered him the position, which Dr. Cheung accepted.

**G.    Dr. Merlo's Age Discrimination Complaints and This Litigation**

56.    In December 2014, Dr. Merlo emailed individuals in the HR department, Dr. Sadeghi, his superiors, and other physicians in the DRO, reporting surprise at learning he was in a temporary appointment when Dr. Sadeghi informed him his appointment would end in May 2015.

57.    Dr. Merlo testified that, in February 2015, Dr. Merlo met with Chief of Staff Dr. Norman and reported that Dr. Sadeghi told Dr. Merlo in November 2014 that Dr. Merlo should retire to make room for younger UCLA residents, and that this was obvious age discrimination.

58.    In March 2015, Dr. Merlo emailed Dr. Sadeghi and several others, recounting what he had told Dr. Norman in February and requesting a permanent appointment.

59.    In April and May 2015, Dr. Merlo participated in mediation through the EEO counselor with Dr. Sadeghi, Dr. Lee, Dr. Norman, and others.  In a Memorandum of Understanding resulting from the EEO mediation, Dr. Merlo acknowledged that he "was hired on a temporary appointment and that the reason for the separation will be recorded as expiration of appointment."  He also acknowledged that Dr. Sadeghi had requested a permanent position and Dr. Merlo could apply

60.    In June 2015, Dr. Merlo filed a formal EEO complaint for age discrimination, of which Dr. Sadeghi was aware by August 12, 2015.

61.    After requesting and receiving a Final Agency Decision from the VA, he timely filed a Complaint in this Court.

### III.    CREDIBILITY FINDINGS

62.    The Court finds the following witnesses very credible: Tanae McNeal and Dr. Cheung.  The Court finds the following witnesses generally credible: Dr. Lorentz, Dr. Lee, and Dr. Sadeghi.   The Court finds the following witnesses generally not credible: Dr. Merlo and Bradford Krutoff.

63.    Regarding Dr. Lorentz, the Court finds his testimony fully credible, despite a seemingly conflicting answer at the outset of his testimony about whether Dr. Sadeghi had ever said anything, to Dr. Lorentz or in general, "about that Dr. Merlo should retire."  Dr. Lorentz later explained that he did not take Dr. Sadeghi's "exact words" at face value for a number of reasons, including Dr. Sadeghi's difficulty with the English language and his non-confrontational and kind staff management.

64.    Regarding Dr. Lee, the Court finds his testimony generally credible, if a bit blustery at times.

65.    Regarding Dr. Sadeghi, the Court finds his testimony generally credible. Dr. Sadeghi initially had difficulty hearing the attorneys' and the Court's questions.  His

responses were equally difficult to understand in light of his sometimes-awkward manner of phrasing things. Accordingly, less weight is given to his testimony, at times, for lack of clarity in his question comprehension or responses. However, once given a hearing assist device, Dr. Sadeghi's question comprehension and response clarity improved greatly. Dr. Merlo's counsel's several attempts to impeach Dr. Sadeghi were unsuccessful. The Court construes Dr. Sadeghi's testimony, prior statements, and emails in the light and context of the Court's first-hand experience with Dr. Sadeghi's "awkward phrasing" and approximate word choices in English, which is not his first language.

66. Regarding Mr. Krutoff, the Court finds his testimony utterly without merit and his memory entirely unreliable. The Court does not consider Mr. Krutoff's testimony.

67. Regarding Dr. Merlo, the Court finds his testimony not credible. Dr. Merlo presents as persistently inconsistent, dramatic, exaggerative, and hyperbolic. The Court similarly finds emails Dr. Merlo has authored and accusations he has levied against colleagues and others not credible. He persists in his own version of events, despite plain contradiction by stark objective evidence. Additionally, VA counsel successfully impeached Dr. Merlo multiple times.

## IV.   CONCLUSIONS OF LAW

68. In this bench trial, Merlo tried two claims, for age discrimination and retaliation in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 ("ADEA").

69. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Dr. Merlo's claims arise under federal law.

70. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Dr. Merlo's claims occurred in this judicial district.

**A.    Age Discrimination—Non-Renewal & Non-Selection**

71.    "[T]he ADEA states in relevant part: 'All personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age.'" *Babb v. Wilkie*, 589 U.S. 399, 404 (2020) (quoting 29 U.S.C. § 633a(a)).)

72.    To prevail on a claim of age discrimination under the ADEA, Dr. Merlo must prove by a preponderance of the evidence that (1) Dr. Merlo suffered an adverse personnel action; (2) Dr. Merlo was forty years of age or older at the time of the adverse action; and (3) the VA would not have taken the adverse action but-for Dr. Merlo's age. Ninth Circuit Model Civil Jury Instruction 11. 1 (May 2023); *Shelley v. Geren*, 666 F.3d 599, 606–07 (9th Cir. 2012); *Babb*, 589 U.S. at 412 (maintaining that age must be but-for cause of the adverse action where plaintiff seeks reinstatement, backpay, or damages).

73.    But-for "causation is established whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) (explaining but-for causation in the sex discrimination context).  As events often "have multiple but-for causes," "a but-for test directs [the court] to change one thing at a time and see if the outcome changes." *Id.*  If the outcome changes, that is a but-for cause. *Id.*

74.    Dr. Merlo satisfies his burden to show that he "suffered multiple adverse employment actions: [initially], when the VA decided not to renew his temporary term of employment, and again, when the VA failed to hire him for the permanent position from either the June 19, 2015 or October 29, 2015 job announcement." *Merlo v. McDonough*, No. 22-55503, 2023 WL 4364409, at *2 (9th Cir. July 6, 2023).

75.    Dr. Merlo also satisfies his burden to show that he was over forty years old at the time of the adverse actions, as "it is undisputed that Dr. Merlo was in his sixties at the time of the non-renewal of his temporary appointment and non-selection for a permanent position." *Id.* at *1.

76.     However, Dr. Merlo does not satisfy his burden to show that his age was a but-for cause of Defendant's decisions not to renew his temporary appointment or not to hire him for the 2015 permanent appointments in the DRO.

> i.     *Non-Renewal*

77.     Drs. Sadeghi and Lee both credibly testified that they believed Dr. Merlo's temporary appointment could not be renewed based on information they received from HR and the Chief of Staff.

78.     Even if they were mistaken, their honest belief that they could not further renew Dr. Merlo's appointment means that Dr. Merlo's age was not a but-for cause of non-renewal.   If Dr. Merlo had been 35 at the time, Dr. Sadeghi would still have believed he was not able to further renew Dr. Merlo's temporary appointment.  *See Bostock*, 590 U.S. at 656.

79.     Dr. Merlo contends that Dr. Sadeghi's November remark about Dr. Merlo retiring shows Dr. Sadeghi was motivated to not renew Dr. Merlo's temporary appointment based on Dr. Merlo's age.  The Court finds this inference unjustified.

80.     The specifics of the remark are disputed.  Dr. Merlo's testimony is not credible.   Setting aside Dr. Sadeghi's consistent denials, Dr. Lorentz's testimony provides valuable context.  Dr. Lorentz credibly testified that Dr. Sadeghi was a kind and non-confrontational staff manager.   Dr. Lorentz understood from conversations with Dr. Sadeghi that Dr. Sadeghi was letting Dr. Merlo down gently because his temporary appointment would not be renewed.  Dr. Lorentz also credibly testified that Dr. Sadeghi did not think highly of Dr. Merlo's treatment style, documentation, or departmental emails.  In light of this persuasive context, Dr. Sadeghi's remark about Dr. Merlo retiring does not give rise to an inference that age was a but-for factor for non-renewal of Dr. Merlo's temporary appointment.

81.     Even assuming Dr. Sadeghi mentioned possible retirement to Dr. Merlo, "[a]sking an employee who is eligible for retirement and performing unsatisfactorily

about retirement does not give rise to an inference of age discrimination." *See, e.g.*, *McCoy v. Barrick Gold of N. Am., Inc.*, 705 F. App'x 645, 646 (9th Cir. 2017).

82.     Dr. Merlo also urges the inference that an August 8, 2014 email from Dr. Lee recommending that Dr. Sadeghi hire Dr. Kang, a UCLA resident, for a permanent appointment at the DRO led Dr. Sadeghi to decide a few weeks later to not renew Dr. Merlo's temporary appointment.  The Court finds this inference unjustified.

83.     The evidence does not support that Dr. Sadeghi decided in August 2014 not to renew Dr. Merlo's temporary appointment.  To the contrary, the evidence shows that in August 2014, Dr. Sadeghi sought to and did renew Dr. Merlo's appointment for an additional six month, from November 2014 to May 2015.  Drs. Sadeghi and Lee credibly testified that they made no decision at that time about the May 2015 expiration of Dr. Merlo's the temporary appointment.

84.     Dr. Sadeghi also testified that he received emails recommending new medical residents frequently, he disregarded the email from Dr. Lee concerning Dr. Kang, and he took no action as a result of the email.  Dr. Sadeghi testified that it was his decision who to hire, not Dr. Lee's.

85.     Furthermore, Dr. Sadeghi did not request approval for a permanent appointment such as the one for which Dr. Lee recommended Dr. Kang until many months later, in the spring of 2015.  That job announcement opened in June 2015, and there is no evidence Dr. Kang applied or was considered.

86.     Finally, the Court rejects Dr. Merlo's other proposed inferences of age discrimination as unsupported.  The preponderance of evidence does not show that the VA treated younger doctors more favorably than older doctors.  The preponderance of evidence also does not show that the VA's reasons for Dr. Merlo's non-renewal were conflicting or contradictory.  To the extent such an inference could be drawn, it is weak at best and does not overcome the credible testimony and evidence that Drs. Sadeghi and Lee believed Dr. Merlo's temporary appointment could not be renewed again.

87.     In sum, Dr. Merlo does not establish by a preponderance of evidence that age was a factor in Dr. Sadeghi's decision not to renew Dr. Merlo's temporary appointment or that it was a but-for cause of that decision.  Instead, the preponderance of evidence shows that Dr. Sadeghi believed the temporary appointment could not be renewed and Dr. Merlo's temporary appointment expired by its terms.

      *ii.*     *Non-Selection*

88.     Dr. Merlo did not satisfy his burden to show that age was a but-for cause of the VA's decision not to hire him into a permanent position.

89.     Dr. Sadeghi, in consultation with Dr. Lee and other DRO physicians, ranked applicants based on their qualifications with respect to the 2015 job announcements.    Dr. Merlo did not rank with the top applicants for either announcement.

90.     Dr. Sadeghi offered the permanent appointment to the top-ranked applicants for both announcements.

91.     When the three top-ranked applicants for the June 2015 job announcement did not accept, the VA decided to re-announce, to garner a wider applicant pool.  The Court does not draw an inference of discrimination from the decision to re-announce. Dr. Sadeghi testified that Dr. Merlo may have ranked fifth at most in the June 2015 applicant pool.  When the top three declined, the VA was not required to hire Dr. Merlo, whom the VA found to be less qualified than the desired applicants, simply because Dr. Merlo was near the top of the rest.  Dr. Sadeghi credibly testified that the quality of applicants had improved, and leadership decided to re-announce the position in the hopes of garnering a higher volume of quality applications.

92.     Dr. Sadeghi offered the permanent position to Dr. Cheung, who ranked in the top three applicants for the October 2015 job announcement.  Dr. Sadeghi found Dr. Cheung to be better qualified than Dr. Merlo based on Dr. Cheung's education, radiation oncology training with the most advanced technology and techniques, extensive research experience, articles and publications, and experience teaching in a

fellowship.  The testimony and CVs of Dr. Cheung and Dr. Merlo objectively support Dr. Sadeghi's evaluation.

93.    The VA job announcements stated that the VA sought a candidate with "sufficient training in the latest state-of-art radiation therapy techniques such as IMRT, IGRT, SRS, and SBRT."  Dr. Cheung specialized in state-of-the-art radiation therapy techniques and was experienced in essentially every technology that was available at the time.  Dr. Merlo was not experienced with and did not have privileges to practice SRS, and Dr. Merlo's CV did not list any of the requisite techniques.

94.    The job announcements stated the candidate would handle "all assigned clinical, educational, and administrative duties and requirements."  Dr. Cheung was motivated to teach residents and sought out the position at the VA in part for that opportunity.   He had experience teaching medical residents and obtained an appointment with UCLA.  Dr. Merlo testified that he also had an appointment with UCLA, but the evidence does not support this.  Dr. Merlo's CV listed an adjunct appointment from 1986 to 1990, and Dr. Merlo failed to produce any evidence, other than his own not-credible testimony, that he held an appointment with UCLA during his time at the DRO.

95.    The job announcements also stated that the candidate was "encouraged to develop research opportunities, and expected to promote and provide educational endeavors for Radiation Oncology residents and staff[.]"  Dr. Cheung possessed ample experience researching and publishing peer-reviewed articles.  He continued his research during his fellowship and sought the position with the DRO in part because of the research opportunities.  His CV reflects his experience and interest in research and educational endeavors.  Dr. Merlo has not published research in thirty-four years.  The one manuscript he worked on during his time at the DRO was reviewed as "results inadequately described" and "discussion poorly written."  Dr. Merlo never attempted to address the reviewers' comments or resubmit the paper.

96.   Dr. Merlo testified that he was the better candidate because he had more experience as a physician.  While it is true that Dr. Merlo had years more experience than Dr. Cheung, Dr. Merlo lacked virtually every other qualification the VA sought in a permanent radiation oncologist.

97.   Dr. Sadeghi was justified in considering Dr. Merlo's colorful history with the DRO.  While at the DRO as a temporary appointment, Dr. Merlo demonstrated unsatisfactory charting, a lack of published research, a failure to pursue the latest advanced techniques and technology for radiation oncology, comments to patients resulting in a sexual harassment complaint, a propensity for sending unprofessional emails, and repeated instances where Dr. Merlo improperly raised issues with senior and higher-level management before raising them first with his supervisor.  Dr. Sadeghi expressed concern that Dr. Merlo's conduct created friction and threatened morale in the DRO.

98.   Dr. Sadeghi's belief that Dr. Cheung was more qualified than Dr. Merlo for the permanent position was credible and convincing.  The VA's decision to place greater weight on Dr. Cheung's research, publication, teaching, and use of modern techniques, over Dr. Merlo's years of private practice, is not evidence of discrimination.

99.   In sum, Dr. Merlo has not proven by a preponderance of the evidence that age was a but-for cause of Dr. Merlo's non-selection.  If Dr. Merlo had been 35 at the time, Dr. Cheung would still have been better qualified than Dr. Merlo for the permanent DRO appointment.  *See Bostock*, 590 U.S. at 656.

**B.   Retaliation**

100.   The ADEA "makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices or participating in any investigation or proceeding under the ADEA."   *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996).

101.   To prevail on the claim for retaliation under the ADEA, Dr. Merlo must prove by a preponderance of the evidence that: (1) he participated in an activity

protected under federal law or opposed an unlawful employment practice; (2) the VA subjected him to an adverse employment action; (3) there is a causal connection between the protected activity and the employer's action.  Ninth Circuit Model Civil Jury Instruction 10.8; *O'Day*, 79 F.3d at 763; *Bergene v. Salt River Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1140–41 (9th Cir. 2001).

102.  The Ninth Circuit applies the same standard in both ADEA and Title VII retaliation cases.  Ninth Circuit Model Civil Jury Instruction 11.3; *see Poland v. Chertoff*, 494 F.3d 1174, 1179–80 n.1 (9th Cir. 2007).

103.  Regarding the causal connection, Dr. Merlo must prove that the "protected activity was a but-for cause of the . . . adverse action by the employer.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

104.  Dr. Merlo satisfies his burden to prove that he participated in protected activity, as he raised informal and formal complaints of age discrimination.  *See Merlo*, 2023 WL 4364409, at *2.

105.  Dr. Merlo also satisfies his burden to prove that the VA subjected him to an adverse employment action "when the VA failed to hire him for the permanent position" in the 2015 job announcements.  *Id.*

106.  However, Dr. Merlo again falters at causation.  He does not satisfy his burden to show that his complaints are a but-for cause of the VA's decision not to hire him for the 2015 permanent appointments.

107.  For the reasons stated above, the VA did not hire Dr. Merlo into the permanent appointment because Dr. Merlo was not the better candidate.  *See supra* § A.ii.  The VA hired the candidate whom Dr. Sadeghi found better qualified.  The Court incorporates Conclusions of Law 88 to 99 here by reference.

108.  The Court finds no support for, and therefore rejects, Dr. Merlo's suggested discriminatory inferences.  For instance, Dr. Sadeghi received notice of Dr. Merlo's formal complaint on August 12, 2015.  He also identified two finalists for the permanent radiation oncologist position on August 27, 2015, fifteen days later.

Dr. Merlo contends the temporal proximity of these events prove that Dr. Sadeghi retaliated against him.  However, the timeline of the June 2015 job announcement undermines such an inference.  The June 2015 announcement closed in early July 2015.  Dr. Sadeghi then evaluated and ranked the applicants in consultation with Dr. Lee and other DRO physicians.  The ranking process proceeded and concluded independently from Dr. Merlo complaints.  Dr. Merlo was not in the top-ranked applicants, which is why he was not identified as a finalist in late August 2015.

109.   Additionally, Drs. Sadeghi and Lee were aware of Dr. Merlo's informal complaints and his EEO action much earlier than August 12, 2015.  They were copied on Dr. Merlo's complaint emails in December 2014 and in the spring of 2015.  They took part in Dr. Merlo's EEO mediation in April and May of 2015.  Thus, any inference of discrimination based on "temporal proximity" between Dr. Sadeghi's receipt of Dr. Merlo's formal complaint and the August 2015 identification of finalists is weak and does not overcome the direct evidence that finalists were selected without regard to Dr. Merlo's protected activity.

110.   In sum, Dr. Merlo does not prove by a preponderance of the evidence that his informal or formal complaints of age discrimination played any role, let alone a but-for cause, of his non-selection.  To the contrary, the testimony and evidence before the Court convincingly establishes that Dr. Merlo was not selected because the selected candidate was better qualified than Dr. Merlo.  Protected activity was not a factor in Dr. Sadeghi's decision.

## C.    Damages & Affirmative Defenses

111.   As Dr. Merlo did not meet his burden of proving that Dr. Sadeghi would have renewed Dr. Merlo's temporary appointment or hired him for a permanent appointment but for his age, or that that Dr. Sadeghi would have selected him for the permanent appointment but for his protected activity, Dr. Merlo is not entitled to recover damages.  The Court does not consider Dr. Merlo's damages or the VA's affirmative defenses.

## V.   CONCLUSION

Dr. Merlo does not meet his burden to prove his claims and the Court finds that the VA is entitled to Judgment in its favor.  In light of the above findings of fact and conclusions of law, the Court **ORDERS** Dr. Merlo and the VA to confer and submit a Proposed Judgment no later than seven (7) days after the date of this order.

**IT IS SO ORDERED.**

June 21, 2024

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**